[No. 31303. Department One. August 31, 1950.]

*In the Matter of the Partnership Estate of* G. A. TEMBREULL, *Deceased.*

R. D. TEMBREULL, *Appellant,* v. EMMA S. TEMBREULL, *Respondent.*[1]

*Simmons & McCann,* for appellant.

*Ervin F. Dailey, Raymond C. Hazen,* and *Philip W. Schoel,* for respondent.

[1]Reported in 221 P. (2d) 821.

BEALS, J.—The late G. A. Tembreull and Emma S. Tembreull were husband and wife. Richard D. Tembreull is Mr. Tembreull's son by a prior marriage. In the record before us, Mr. Tembreull, Sr., is referred to as Fred, and Richard D. Tembreull as Dick, and we shall so refer to them.

Fred engaged extensively in the business of liquidating various classes of property, including the assets of a local loan association. He also was engaged in business as a "discount purchaser" and maintained an office in the Northern Life Tower, Seattle. Dick was a police officer of the city of Seattle, and Fred gradually associated Dick with him in his business operations. H. M. Short was sometimes associated with Fred in business deals. Fred's wife, Emma S. Tembreull, occasionally worked with her husband in his office as a stenographer.

Evidently at his father's suggestion, Dick concerned himself with the purchase of some of the property of the insolvent loan association. Fred also became interested in the assets of a California loan association and spent some time in that state. Fred kept a journal and ledger and other accounts in connection with his financial transactions.

Fred died October 18, 1945, leaving a will naming his wife, Emma, as sole beneficiary. Thereafter, this will was admitted to probate by the superior court for King county, and letters testamentary thereon issued to Emma.

Dick filed his petition for appointment as administrator of the partnership estate and, by order dated December 14, 1945, he was appointed such administrator and filed an inventory of the assets of the partnership estate.

February 5, 1946, Emma S. Tembreull, as executrix of her late husband's will, filed her petition praying, *inter alia,* that Dick be required to show cause why he should not be removed as administrator of the partnership estate. The issues upon this petition having been completed and testimony having been taken before the Honorable Robert M. Jones, the court entered an order May 17, 1946, revoking the letters of administration which had been issued to R. D.

Tembreull, and appointing M. K. Copass, a member of the bar of this court, as administrator of the partnership estate, the order also directing Mr. Copass to prepare an accounting of the partnership property.

September 3, 1947, Mr. Copass filed his "preliminary account," consisting of eighty-eight typewritten pages, and later filed other lengthy accounts disclosing records and figures which he discovered in the books and accounts turned over to him.

Dick filed exceptions to the Copass account, asking that the same be not approved until it had been audited and "the items therein shown reconciled by a certified public accountant."

The evidence introduced at the first hearing before the Honorable Robert M. Jones comprises three hundred seventy-five pages of the statement of facts. Later, the matter was assigned to the department presided over by the Honorable Donald A. McDonald, and further testimony was introduced, the statement of facts containing this testimony comprising over nine hundred pages.

During October, 1947, the matter came on for hearing before Judge McDonald on the preliminary report of Mr. Copass as referee. An extensive hearing was had and, December 9, 1947, the trial court entered an order declaring certain property to pertain to the partnership, denying Dick's claim for compensation for preparing the accounting, disallowing certain charges by Dick for traveling expenses, declaring that a personal account of Dick in a Seattle bank became a partnership account as of June 1, 1944, declaring an account which Dick had opened at another bank "under the assumed name of 'James Caldwell' " to be a partnership account, declaring other property to be an asset of "the partnership of G. A. Tembreull, Richard Tembreull and H. M. Short," declaring the sale of seven lots by Dick to himself "under the assumed name of 'Caldwell' " to be an illegal transaction and charging Dick with an accounting concerning the same, and declaring four lots formerly the

property of G. A. and Emma Tembreull to be, to some extent, partnership assets.

The matter dragged along and came on before the court for final hearing. Counsel for all parties were present, argument was had, and, October 11, 1949, the court entered findings of fact and conclusions of law, followed by a decree stating that the order removing R. D. Tembreull as administrator of the partnership property was proper and correct, and that:

"Because of the acts and omissions of the surviving partner, Richard D. Tembreull, and of his complete breach of duty as trustee, and his complete failure to keep and maintain books of account of the partnership affairs of himself and G. A. Tembreull, and because of his failure and inability to supply such information in connection with the management of said partnership as to make possible the rendition of an accurate accounting, and because of his attempts to purchase assets of the partnership under an assumed name, because of his conversion of partnership assets to his own use, because of his attempt to charge the partnership with a salary for his services, and particularly because such conduct, acts and omissions make it impossible to [for] the court or its special referee to establish a just and accurate final accounting,—the said Richard D. Tembreull is divested of any interest in and to the remaining assets of this partnership, and should be and is hereby adjudged not entitled to participate in any division of the remaining partnership assets, but should be and is hereby barred therefrom."

The decree continued by providing that Mr. Copass should proceed with the completion of the administration of the partnership estate.

From this decree, R. D. Tembreull (Dick) has appealed, making the following assignment of errors:

"(1) The court erred in holding that the entire responsibility for a partnership accounting rested upon Dick Tembreull.

"(2) The court erred in ruling Dick Tembreull did not fully disclose all partnership data in his possession.

"(3) The court erred in holding that an accounting of the partnership affairs could not be made.

"(4) The court .erred in refusing to permit Dick Tem-

breull to have the final account of the administrator reconciled by a certified public accountant.

"(5) The court erred in not receiving the final account and holding the parties bound by their written stipulation and order pursuant to which said accounting was made by the administrator.

"(6) The court erred in giving the entire partnership estate to Emma Tembreull.

"(7) The court erred in denying motion for new trial."

It may be observed that Rule of Supreme Court 16, subd. 5, 18 Wn. (2d) 18-a, referring to "Contents and Style of Briefs," reads in part as follows: "Each error relied on shall be clearly pointed out and discussed under appropriate designated headings." While appellant presents formal assignments of error, they are not referred to in the brief under "appropriate" or any headings, all being discussed under "Argument."

Hereafter, we refer to Dick as appellant.

The business association between father and son apparently dated from 1941 and continued until Fred's death in 1945, appellant evidently keeping most of the records on the various projects conducted by the partnership. Fred spent considerable time in California from June, 1944, until September, 1945. Apparently, appellant managed the partnership business. He testified that he personally conducted the business, his father occasionally advising him.

There was testimony to the effect that Fred kept a "personal journal," making some entries therein concerning the partnership business. This book, whatever it may have been, disappeared after Fred's death and was not available on the trial. While admitting that, after his father's death, he removed some papers or records from his father's desk, appellant denied any knowledge of the account book. He testified that he took from his father's desk "everything that pertained to the properties that was under my management, because I was the one that put them in there."

Respondent testified that she knew something of the books which her husband kept, including "a journal," but that she never saw this book after she left with her husband for Cali-

fornia in July, 1945. She further testified that "Dick kept the partnership books. My husband had his own personal books. He always kept them for years."

H. M. Short, called as a witness by respondent, testified that appellant kept partnership account books, including a ledger, and that he had seen appellant making entries in these books from "slips of paper and a checkbook and stuff like that he would take out and put in the book." He further testified that appellant kept accounts of the deals in which the witness was interested, stating "Dick also kept my book. When he and I went together in the deals and he kept the books, my income tax was copied from Dick's books."

In the course of the hearing before Judge Jones, the court observed, concerning those of appellant's accounts which were before the court: "And these which are referred to as books are mere statements made up. They are not books of account kept as the transactions transpired. They are something that developed later." Later during that trial, the court observed: "I agree with both of you, gentlemen. Neither the witness nor anyone else could audit these."

In the course of the hearing before Judge McDonald, the court stated:

"I have never seen such ill kept records as those kept by the respondent [appellant here], and in many, many cases it is quite apparent that he was far from making a full and frank disclosure."

Testifying concerning the records which he produced, appellant said, in connection with some particular account: "That is my complete record. I don't believe it is on there. Those are admittedly incomplete."

One of the operations conducted by appellant, his father, and Mr. Short was the purchase of thirty-seven lots in Brookwood Park Addition. These lots were purchased from a bank, the deed running to appellant's wife under her maiden name of Kaye Ryan. The partnership allowed appellant a credit of four hundred dollars by way of a commission on the purchase. On direct examination, appellant

testified that the partnership sold thirty of the lots, and continued:

"Q. What became of the remaining 7 lots? What did you do with them, if anything? A. I sold them to James Caldwell. Q. Who is James Caldwell? A. Myself. Q. Did you have a certified—a certificate of that name on file with the County Clerk at the time? A. No, not at that time. A short time later. Q. And did you disclose—was your father living at that time? A. Yes. Q. Did you disclose at that time to your father that you were buying under an assumed name? A. I told him I wanted them, and I was going to buy them under an assumed name for one reason that was because if Herb [Mr. Short] knew— [Objection by Mr. Shoel.]"

Appellant testified that, at the time the seven lots were conveyed to "James Caldwell," neither his father nor Mr. Short nor respondent knew that James Caldwell was appellant's alias.

Appellant also opened a bank account in the name of James Caldwell and, on the trial, it was admitted that he withdrew partnership funds from another bank and deposited them in the Caldwell account.

Appellant testified that, as to many transactions concerning the partnership business, he kept notes on slips of paper and that, later, he copied these, making the records which he presented in the case at bar, and destroyed the original memoranda.

Appellant correctly argues that, in the absence of an agreement between the parties, the duty of keeping full and accurate partnership accounts rests equally upon each partner. However, it appears that appellant attended to most of the details of the partnership business. He controlled entirely the improvement of one tract of land, by removing timber (which was sold). The general management of the properties after their purchase, including in most instances, the sale of the property, was controlled by appellant and he was the only person who could keep books or accounts concerning the projects which he conducted. It also appears that we do not know what books or accounts Fred had.

Respondent found in her husband's desk one book containing some partnership records. She testified that her husband had kept at least one other account book which she was unable to find. She did find some receipts, "billings," and so forth, in connection with her husband's management of what she referred to as "the ranch," which he had filed prior to the time he went to California. She also found several volumes of checkbook stubs containing some entries evidently referring to partnership affairs.

Certainly, the accounts produced by appellant could nowise be considered as proper or adequate records of the partnership operations conducted by him. The accounts presented by Mr. Copass were very extensive but often inconclusive, due to lack of necessary data.

The trial court, in its memorandum decision of October 31, 1947, referred to the fact that, after more than a week of "prolonged day, and even night, sessions," the matters were still confused. As indicated by the memorandum decision, the court was satisfied that appellant received "considerably more money than he has credited," but stated that the amount could not be determined from the evidence.

During the hearing before Judge Jones, which commenced May 13, 1946, R. D. Bowes, a certified public accountant, testified on behalf of the respondent here. The witness examined the available records in appellant's possession and made "work sheets," which he testified were not an audit. We quote from the examination of the witness:

"Q. (by Mr. Schoel) Was it possible to make an audit, Mr. Bowes, of the books that Mr. Tembreull had? A. Yes, I think it would be possible if a person wanted to do it. Q. Didn't Mrs. Tembreull ask you to make an audit? A. I didn't care to go any further in the matter, and I advised her. Q. What was your reason for that? MR. SIMMONS: Objected to as immaterial. MR. SCHOEL: It is not immaterial, your Honor. THE COURT: Well, it is just the opinion of the witness. Sustained."

Mr. Copass testified that "if all the questions which are here, are solved, I don't see why I couldn't complete an accounting."

Appellant argues that, in view of the foregoing testimony, the trial court erred in not referring the exhibits in the case to a certified public accountant for an audit.

The trial court was of the opinion that appellant, by his conduct as disclosed by the evidence, had forfeited all right to share in the partnership assets. If the court was correct in this holding, of course no accounting was necessary.

From the record before us, we are convinced that there were partnership accounts which would have been important evidence in the case at bar that were never produced before the court. Appellant admitted that he destroyed the memoranda containing original entries concerning certain of the partnership transactions, but, as to any other accounts, whether kept formally in books or informally on separate sheets of paper, the record contains no evidence concerning their disappearance, save the denials of respondent and appellant that any were destroyed or were available but not produced.

The trial court was of the opinion that the case of *Simich v. Culjak,* 27 Wn. (2d) 403, 178 P. (2d) 336, was controlling upon the facts in the case at bar.

In the case cited, it appeared that four partners signed written articles of copartnership for the purpose of engaging in coal mining in King county. At the outset, each partner contributed five hundred dollars, and any larger contribution by a partner was to be " 'considered a debt to him from the partnership.' " Additional contributions were made by respondent and appellant. One partner withdrew, and, later, a receiver was appointed, the business was liquidated, and over three thousand dollars deposited in court for the benefit of the partners. An order was entered dissolving the partnership and directing that two of the partners submit full accounts of the partnership assets, and the amount of money due each partner, together with the interest of each partner in the assets. An accounting was made by an auditor, one partner excepting thereto. After the trial, the court entered a decree directing that the money on deposit be divided unequally between two of the three partners. The

third partner, Culjak, who was denied any share in the fund, appealed to this court.

The trial court found that Culjak " 'was in full charge of the business of the partnership, acted as the manager thereof, received and disbursed substantially all cash belonging to the partnership; that he kept the time-books of all parties employed by the partnership.' " The court also found that Culjak's failure to keep proper books of account and to furnish a detailed account of the partnership business amounted to a fraud upon the respondent.

In the course of the opinion, this court said:

"It is the universal rule that partners are required to exercise the utmost good faith toward each other, and, where an accounting is had, it is the duty of a partner who manages, conducts, or operates a partnership business, to render complete and accurate accounts of all of the partnership business. This rule is grounded upon the theory that the managing partner is acting as à trustee for his firm. [Citing cases.]

"When a managing partner who keeps the books is sued for settlement, he must sustain the burden of proof of the correctness of the account. In so doing, he will be held to strict proof of the items of his account. This proof must be by way of the books of the firm, showing the income and expenses, together with the necessary vouchers and checks, and the amounts of the various items. [Citing cases.]"

We cited the case of *Bingham v. Keylor,* 25 Wash. 156, 64 Pac. 942, and quoted from that case the following:

" 'If the agent *wholly* fails to recognize the duties and responsibilities imposed upon him by his situation, or so conducts himself that his services are of no value, it is entirely just and reasonable that he should receive no compensation whatever; and to this extent the law is well settled.' "

The court then quoted the following statement from 2 Lindley, Partnership (2d Am. ed.) 948:

" ' "If no books of account at all are kept, or if they are so kept as to be unintelligible, or if they are destroyed or wrongfully withheld, and an account is directed by a court, every presumption will be made against those to whose negligence or misconduct the non-production of proper accounts is due." ' "

The court also cited *Escallier v. Baines,* 40 Wash. 176, 82 Pac. 181, in which it was held that the evidence warranted the distribution of all assets to the plaintiff in the action, where it appeared that the plaintiff had contributed cash to the defendant in an established butchering business, the defendant having had entire control of the business, handled all the money, and failed to keep any records or accounts.

In the *Simich* case, the court noted that appellant Culjak, in addition to his failure to account, had withdrawn from the partnership account the bank balance, which he contended he had used for the benefit of the partnership, but failed to supply any proof of his assertion. The judgment of the superior court was affirmed.

In the case at bar, the court made extensive and definite findings of fact and conclusions of law which support the decree appealed from, including specific findings of fact concerning the acts and omissions of appellant.

█  Appellant's first assignment of error is without merit. Certainly, under the facts shown, responsibility for preparing an account of the partnership business rested upon appellant. He had attended to the greater part of the partnership business, particularly that portion which called for the keeping and preservation of accurate accounts.

We find no merit in appellant's second assignment of error. A ruling that appellant had not fully disclosed all partnership data in his possession is supported by the evidence.

By his third assignment of error, appellant questions the court's ruling that an accounting of the partnership business could not be made. From the data before the court, it was evident that no adequate accounting could have been made.

By his fourth assignment of error, appellant contends that the court erred in refusing to permit appellant to have the partnership accounts reconciled by a certified public accountant. A supplemental statement of facts discloses the proceedings before the court July 29, 1949, when appellant presented his exceptions to the report filed by Mr. Copass June 30, 1949. Appellant then argued that the report ren-

dered by Mr. Copass should be reconciled by a certified public accountant. If appellant desired that an accountant go over the report, we see no reason why he did not have that accomplished. The report was a public record at all times after it was filed. In any event, the trial court ruled that appellant, by his conduct, should be barred from participation in any of the partnership property.

By his fifth assignment of error, appellant contends that the trial court erred in not receiving the final account and holding the parties bound thereby. We find no error in this connection.

Finally, by his sixth and seventh assignments of error, appellant contends that the court erred in barring him from any share in the partnership property, and in denying his motion for a new trial. For the reasons above stated, the court did not err in entering the decree.

Finding no error in the record, the decree appealed from is affirmed.

SIMPSON, C. J., SCHWELLENBACH, GRADY, and DONWORTH, JJ., concur.